IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

VICTOR HUNT,

            Petitioner,             No. CIV S-03-1723 MCE EFB P

    vs.

GEORGE M. GALAZA,

            Respondent.         __FINDINGS & RECOMMENDATIONS__

_____/

       Petitioner is a state prisoner proceeding without counsel on a petition for a writ of habeas

corpus pursuant to 28 U.S.C. § 2254.  He challenges the constitutionality of his 2000 conviction

for second degree murder and two firearm charges.  He contends that (1) his Sixth Amendment

right to effective assistance to counsel was denied because his trial counsel failed to conduct

adequate pre-trial investigation and failed to present material evidence at the hearing on

petitioner's motion for a new trial; (2) his Sixth Amendment right to a fair trial and his

Fourteenth Amendment right to due process were violated because a witness perjured himself on

the witness stand during trial; (3) his Sixth Amendment rights to a fair trial and an impartial jury

and his Fourteenth Amendment right to due process were violated because a juror lied during

voir dire and introduced extra-judicial information into the deliberations; and (4) his Sixth

Amendment right to a fair trial and his Fourteenth Amendment right to due process were violated

1

because the district attorney failed to disclose favorable evidence during discovery and vouched for the credibility of the witness who perjured himself.[1]  Upon careful consideration of the record and the applicable law, the undersigned finds that petitioner's application for habeas corpus relief must be denied.

## PROCEDURAL BACKGROUND

In 2000, a jury found petitioner guilty in San Joaquin County Superior Court of second degree murder and two firearm charges.  Pet. at 2; Answer at 1-2.  As a result, petitioner was sentenced to a state prison term of forty years to life with the possibility of parole.  Pet. at 2; Answer at 1.

Petitioner appealed his convictions and sentence to the California Court of Appeal for the Third Appellate District.  Pet. at 3; Answer, Ex. A.  However, on November 21, 2001, the appellate court denied petitioner relief and affirmed his conviction and sentence.  Pet. at 3; Answer, Ex. B.  Petitioner then filed a petition for review in the California Supreme Court, which was denied on January 29, 2002.  Pet. at 3; Answer, Exs. C, D.  On November 22, 2002, petitioner filed a petition for writ of habeas corpus before the California Supreme Court; the petition was denied on May 14, 2003.  Answer, Exs. E, F.  Petitioner's federal habeas petition was received for filing by this court on July 15, 2003.

## FACTUAL BACKGROUND[2]

> Although the accounts of the eyewitnesses vary in some respects, it is undisputed [petitioner] shot the victim in the forehead at close range.  He and his witnesses contended this was uncharacteristic behavior, and arose out of his perception of the need to defend himself or another.

////

---

[1]  Petitioner also contends, in a conclusory manner, that he is factually innocent of second degree murder because his actions were committed in a heat of passion and in self-defense.  Pet. at 2.  Petitioner does not assert, however, that he is entitled to habeas relief on this ground.

[2]  This factual background is taken from the unpublished opinion of the Third District Court of Appeal and is presumed correct.  Answer, Ex. B at 2-5; *see* 28 U.S.C. § 2254(e)(1).

1  According to [petitioner], he agreed to accompany Simon White on
   a ride to Modesto on the afternoon of December 24, 1998.  Before
2  departing Stockton, Mr. White stopped at the residence of Kuleza
   "Kool-Aid" Vega.  As this was near his father's apartment,
3  [petitioner] decided to visit his father.  [Petitioner] went up to his
   father's residence, but no one was home.  When [petitioner] got
4  back to the front of the building, he did not see Mr. White.  Uneasy
   about the neighborhood, he retrieved a communally available
5  handgun of which he was aware from its covert niche behind the
   building.  He then saw Mr. White standing by his car near the rear
6  entrance to the apartment complex.  [Petitioner] rejoined Mr.
   White.  They drove a short distance to Mr. Vega's residence and
7  parked.  Mr. White got out of the car and began talking with two
   men a couple of feet from the open driver's door.  [Petitioner] was
8  not paying attention until he noticed one of the men pull a knife
   from his pocket.  [Petitioner] got out of the car, drawing his
9  weapon.  He asked the man holding the knife to leave.  The man
   started walking toward him.  When the man was about four to five
10 feet away, [petitioner] told him to stop.  [Petitioner] fired his
   weapon without aiming or intending to kill the man.  He asked Mr.
11 White to drive away.  They proceeded to Modesto.

12 Mr. White testified in exchange for prosecution on lesser charges.
   He and [petitioner] had shared some marijuana earlier in the
13 morning.  [Petitioner] called him later that day and asked for a ride
   to his father's apartment.  Mr. White agreed, because he wanted to
14 give a ride to Mr. Vega, who lived in that vicinity.  When they
   arrived at the neighborhood, they parked.  Two men approached
15 them.  Mr. White knew one of them (Pete Rangel); the victim was
   the other.  The two men asked if Mr. White and [petitioner] knew
16 where to obtain drugs.  [Petitioner] said he could get some around
   the corner.  The two men got in the car with them and the four of
17 them drove to another location.  As they were driving, Mr. White
   saw Mr. Rangel's hand reach into the front seat, but he did not see
18 any cash.  After they parked, Mr. White walked to Mr. Vega's
   apartment, but no one was home.  When he returned, [petitioner]
19 was arguing with the two men, Mr. Rangel urging [petitioner] to
   return something to the victim.  Mr. White got into his car to
20 depart, leaving [petitioner] to visit with his father.  As he backed
   up, he saw Mr. Vega and his girlfriend in another car with an older
21 man and another passenger.  He then heard the sound of gunfire.
   He turned and saw a gun in [petitioner's] hand.  Mr. White never
22 heard the victim threaten them, and never saw a weapon in the
   victim's possession.  The victim dropped to the ground.
23 [Petitioner] walked quickly back to Mr. White's car and asked him
   to drive off.  [Petitioner] got out of the car a short distance away.
24
25 Mr. Rangel testified he and the victim decided to get some drugs as
   party favors.  They walked across the street and saw Mr. White,
26 whom he knew.  Mr. White and [petitioner] said they could obtain
   the goods for them.  They got in the car.  The victim gave one of

3

them $20; Mr. Rangel believed it was Mr. White.  All the men got out of the car.  When no drugs were forthcoming, the victim began demanding his money back.  [Petitioner] said, "Do you want me to pop a cap on you?"  He then pulled a gun from his pocket and shot the victim.  The victim did not have any sort of weapon, and had not threatened [petitioner] or Mr. White.

Gerald Spinks was familiar with [petitioner] from watching him play basketball.  Shortly before the shooting, he had met Mr. Vega while evangelizing at the welfare office.  Mr. Vega noted that he and his pregnant girlfriend were facing eviction.  Mr. Spinks offered his help, and the next day Mr. Vega asked for a ride to look at another residence.  When they returned and pulled into the parking lot, Mr. Spinks noticed what appeared to be a drug transaction by a car.  Mr. White was standing between his door and the car.  Two men were standing in front of him.  [Petitioner] was sitting in the passenger seat.  The victim had his hand behind his back holding what looked like some kind of nutcracker, and was demanding something from Mr. White.  Then [petitioner] got out of the car and shot the victim.  [Petitioner] got back into the car and told Mr. White to drive off.  The car pulled out of the parking lot.

Mrs. Spinks did not pay attention to the crowd around the car, beyond noticing that the victim was holding his hand behind his back.  After he was shot, she saw something silvery in that hand as he fell to the ground.

Mr. Vega's girlfriend was familiar with the people in the group by the car except for [petitioner].  She noticed the victim arguing with [petitioner] (while Mr. White was talking on his cellphone) and shaking his head while holding his hand behind his back.  She could see something silver in his hand.

When paramedics and police arrived at the scene, they found a multi-purpose tool beneath the victim.  A two and a half-inch knife blade was extending from the tool when an officer picked it up.

DISCUSSION

I.      Standards of Review Applicable to Habeas Corpus Claims

Pursuant to 28 U.S.C. § 2254, a person in custody under a state court judgment may

apply for a writ of habeas corpus "on the ground he is in custody in violation of the Constitution

or laws or treaties of the United States."  28 U.S.C. § 2254(a).  Because petitioner filed his

application for a writ after the effective date of the Antiterrorism and Effective Death Penalty

Act ("AEDPA"), the writ may not be granted with respect to any claim that was adjudicated on

4

1  the merits in state court unless the state court's adjudication of the claim:

2          (1) resulted in a decision that was contrary to, or involved an
           unreasonable application of, clearly established Federal law, as
3          determined by the Supreme Court of the United States; or

4          (2) resulted in a decision that was based on an unreasonable
           determination of the facts in light of the evidence presented in the
5          State court proceeding.

6  *Id.* § 2254(d) (referenced herein as § 2254(d) or AEDPA); *see also Penry v. Johnson*, 532 U.S.

7  782, 792-93 (2001); *Williams v. Taylor*, 529 U.S. 362 (2000); *Lockhart v. Terhune*, 250 F.3d

8  1223, 1229 (9th Cir. 2001).

9          Under the "contrary to" clause of § 2254(d)(1), a writ may be granted if the state court

10  "applies a rule that contradicts the governing law set forth in [Supreme Court] cases, 'or if it

11  confronts a set of facts that are materially indistinguishable from a decision' of the Supreme

12  Court and nevertheless arrives at a different result." *Early v. Packer*, 537 U.S. 3, 8 (2002)

13  (quoting *Williams*, 529 U.S. at 405-06).  Under the "unreasonable application" clause, a writ

14  may be granted if the state court identifies the correct governing legal principle from the

15  Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's

16  case.  *Williams*, 529 U.S. at 413.

17          In determining whether the state court's decision is contrary to, or an unreasonable

18  application of, clearly established federal law, a federal court looks to the last reasoned state

19  court decision addressing the merits of the petitioner's claim.  *Robinson v. Ignacio*, 360 F.3d

20  1044, 1055 (9th Cir. 2004).  If, however, there is no reasoned state court decision, the district

21  court must independently review the record to determine whether the state court's ruling was

22  contrary to or an unreasonable application of clearly established federal law.  *Delgado v. Lewis*,

23  223 F.3d 976, 981-82 (9th Cir. 2000).

24  ////

25  ////

26  ////

II.    <u>Petitioner's Claims</u>

    A.    <u>Ineffective Assistance of Counsel</u>

    Petitioner contends that his Sixth Amendment right to effective assistance of counsel was denied because his trial counsel failed to conduct adequate pre-trial investigation into the background of prosecution witness Gerald Spinks.  Pet. at 5.  Petitioner contends that had his trial counsel properly investigated Mr. Spinks, he would have discovered that although Mr. Spinks testified at trial that he was a minister at West Coast World Outreach Church, he was not actually a minister.  *Id.* at 5A.  Petitioner argues that because the jurors believed Mr. Spinks was a minister, they gave his testimony more weight than they otherwise would have.  Traverse at 6.  In this regard, petitioner submits declarations from jurors Jones and Gant, averring that they would have viewed the case differently if they had known that Mr. Spinks was not employed as a minister.  Pet., Exs. A, B.  Juror Gant also avers that she "voted for conviction based upon the testimony of Gerald Spinks."  *Id.*, Ex. B.  Petitioner further contends that he was denied effective assistance of counsel because his trial counsel failed to submit those declarations in support of his motion for a new trial.  *Id.* at 5A.

    Respondent counters that the state Supreme Court's rejection of petitioner's ineffective assistance of counsel claim was not contrary to or an unreasonable application of clearly established United States Supreme Court precedent and that the claim therefore does not warrant federal habeas relief.  Answer at 15-19.  Respondent argues that it was reasonable for petitioner's trial counsel not to expend additional resources and time investigating the details of Mr. Spinks's background because he had no reason to question whether Mr. Spinks was a minister.  *Id.* at 16.  Respondent further argues that counsel's failure to investigate was not prejudicial to petitioner.  *Id.* at 16-17.  Respondent contends that the declarations of jurors Jones and Gant are inadmissible under Federal Rule of Evidence 606(b), but that even if they are admissible, they do not establish a reasonable likelihood that but for counsel's failure to investigate Mr. Spinks's background and failure to impeach Mr. Spinks's testimony at trial,

petitioner's trial would have had a different result.  *Id.* at 17.  As respondent notes, the

declarations only state that the two jurors would have viewed the evidence "differently" if they

had known Mr. Spinks was not a minister – they do not state that such information would have

changed their ultimate decision regarding petitioner's guilt.  *Id.*  Moreover, respondent argues,

the two jurors did not hear any of the evidence that was presented at petitioner's new trial

hearing, including evidence regarding Mr. Spinks's role as a community "minister."  *Id.*

Respondent contends that even assuming that the jury would have accorded Mr. Spinks less

credibility had they known he was not an ordained minister, there is no likelihood of a different

result because the only real issue at trial was whether petitioner acted in self-defense after the

victim came at him with a knife (as petitioner contended), and Mr. Spinks's testimony that he did

not see the victim come at petitioner with a knife was corroborated by the testimony of Simon

White, Pete Rangel, Antoinette Buckley, and Robin Spinks.  *Id.* at 18.

      Petitioner first raised the issue of Mr. Spinks's allegedly false testimony in his state court

motion for a new trial.  Petitioner argued that he should be granted a new trial based on newly

discovered evidence that a key prosecution witness (Mr. Spinks) enhanced his credibility in the

eyes of the jury by falsely claiming to be the minister of an organized church.  Clerk's Tr. on

App. ("CT") at 405-409; Reporters' Tr. on App. ("RT") at 1012-1018.  At the hearing on the

motion, petitioner called to the stand Kenneth Purkiss, an administrator and associate pastor for

the West Coast World Outreach Church (the church at which Mr. Spinks stated at trial he was a

minister).  RT at 960.  Mr. Purkiss testified that Mr. Spinks attended the church off and on for

four or five years but was never a minister and never had a paid position with the church.  *Id.* at

961-62.  Mr. Purkiss also testified that although the church has no formal position of  "minister,"

the church does encourage its members to minister to others.  *Id.* at 965-67.  According to Mr.

Purkiss, Mr. Spinks had told him on two occasions that he was doing "street ministry."  *Id.* at

969.

////

7

1    Petitioner also called to the stand private investigator Dan Randolph, who interviewed

2    Mr. Spinks in preparation for petitioner's trial. *Id.* at 970.  According to Mr. Randolph, Mr.

3    Spinks told him that the West Coast World Outreach Church was his church; when Mr.

4    Randolph asked Mr. Spinks if he preferred to be addressed as reverend or minister, Mr. Spinks

5    said that he preferred the term minister. *Id.* at 971.  Mr. Randolph therefore surmised that Mr.

6    Spinks was a paid church staff member and made no further effort to investigate his background

7    prior to petitioner's trial. *Id.* at 970-75.

8    The trial court denied petitioner's motion for a new trial on the grounds that (1) "Mr.

9    Spinks was never anything other than accurate with the Court in terms of his testimony about

10   what he was doing and what church he was associated with"; (2) petitioner could have

11   discovered the evidence regarding Mr. Spinks before trial if he had exercised reasonable

12   diligence; and (3) there was no reasonable probability of a different result had the information

13   been discovered earlier. *Id.* at 1012-18.

14   On appeal, petitioner again did not directly argue ineffective assistance of counsel but

15   instead argued that the trial court improperly denied his motion for a new trial on the newly

16   discovered evidence claim.  Answer, Ex. A at 53-72.  The California Court of Appeal issued a

17   reasoned decision rejecting the claim as follows:

18   At trial, the prosecution had asked Gerald Spinks whether he had
     any involvement in the Stockton community "in any aspects."  The
19   witness responded that he was a "minister at West Coast World
     Outreach Church."

20
     In his motion for new trial, [petitioner] claimed he had newly
21   discovered evidence that Mr. Spinks was not in fact a minister of
     the church.  A defense investigator had spoken with Mr. Spinks at
22   his home before trial (in June 1999); when asked, Mr. Spinks
     stated he preferred to be addressed as "minister."  From this, along
23   with Mr. Spinks' comment that the West Coast World Outreach
     Church was "his church," the investigator assumed Mr. Spinks was
24   the pastor.  The investigator did not make any further inquiry at the
     church or otherwise about Mr. Spinks.  However, after the verdict,
25   the investigator spoke with an administrator (and associate pastor)
     at the church, who told him Mr. Spinks was not in any position of
26   authority (whether paid or voluntary) at the church.  The assistant

8

pastor explained there was no position in the church labeled "minister" as such, although the church encouraged all members to evangelize and Mr. Spinks told him on a couple of occasions that he was engaged in "street ministry."  After a newspaper identified him as a pastor, Mr. Spinks told the associate pastor this was a misunderstanding.

The trial court denied the motion on three bases.  First, it did not believe Mr. Spinks misidentified himself, because the question posed to him at trial asked about his activities in the Stockton community and he was indeed acting as a street minister for the church.  Next, it found a lack of diligence on [petitioner]'s part in investigating the background of what it termed a "key witness."  Finally, it did not believe it was reasonably probable that presenting this new "impeachment" evidence would lead to a different result.  We agree with all three grounds.

In a church with no formal title of "minister," we do not find it inaccurate for a parishioner that evangelizes at a welfare office to describe himself as a minister of his church.  This is among the colloquial usages of the term to describe one as acting as an agent of a religious movement.

[Petitioner] does not offer any justification for failing to investigate the readily available background of Mr. Spinks before trial, thus we do not find an abuse of discretion in this part of the ruling.  Although he notes *the church* first became aware during the trial of the sobriquet by which Mr. Spinks chose to be known, the church did not alert the defense about this.  Rather, the investigator simply had finally taken the step omitted before trial of speaking with church representatives.

Finally, . . . there is nothing in the testimony of Mr. Spinks harmful to [petitioner] even as magnified with the presumably enhanced credibility adhering to one perceived as an ordained minister.  From the outset, Mr. Spinks indicated a positive opinion of [petitioner], describing the "pleasure" of speaking with him in the past and watching him play basketball.  He in fact corroborated [petitioner]'s theory of self-defense, describing an agitated victim holding a possible weapon behind his back.  Mr. Spinks otherwise concurred with the other witnesses in failing to notice that the victim ever advanced on [petitioner] despite warnings.

In short, even if we were to accept the proposition that a self-designated "minister" who evangelizes has less credibility than that of ordained clergy, it is [petitioner]'s own fault he failed to discover and thereby clarify Spinks' status with his church before trial and it is not prejudicial under any normative standard.  We thus reject the argument.

Answer, Ex. B at 8-10 (emphasis in original).

9

Although the state trial and appellate courts issued reasoned opinions addressing the merits of petitioner's claim that the newly discovered evidence that Mr. Spinks was not a minister entitled him to a new trial, neither court specifically addressed petitioner's ineffective assistance of counsel claim. Additionally, it appears that the declarations of jurors Jones and Gant were not submitted to the appellate court. *See* Answer at 15, Ex. A at 53-72. Therefore, this court will independently review the record to determine whether the California Supreme Court's ruling on this claim was contrary to or an unreasonable application of clearly established federal law. *Delgado*, 223 F.3d at 981-82.

The Sixth Amendment guarantees the effective assistance of counsel. The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in *Strickland v. Washington*, 466 U.S. 668 (1984). To support a claim of ineffective assistance of counsel, a petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness. *See Strickland*, 466 U.S. at 687-88. After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance. *Id*. at 690; *Wiggins v. Smith*, 539 U.S. 510, 521 (2003). Second, a petitioner must establish that he was prejudiced by counsel's deficient performance. *Strickland*, 466 U.S. at 693-94. Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id*. at 694. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Id.*; *see also Williams*, 529 U.S. at 391-92; *Laboa v. Calderon*, 224 F.3d 972, 981 (9th Cir. 2000). A reviewing court "need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies . . . . If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice . . . that course should be followed." *Pizzuto v. Arave*, 280 F.3d 949, 955

1   (9th Cir. 2002) (quoting *Strickland*, 466 U.S. at 697).

2        In assessing an ineffective assistance of counsel claim "[t]here is a strong presumption

3   that counsel's performance falls within the 'wide range of professional assistance.'" *Kimmelman*

4   *v. Morrison*, 477 U.S. 365, 381 (1986) (quoting *Strickland*, 466 U.S. at 689).  There is also a

5   strong presumption that counsel "exercised acceptable professional judgment in all

6   significant decisions made." *Hughes v. Borg*, 898 F.2d 695, 702 (9th Cir. 1990) (citing

7   *Strickland*, 466 U.S. at 689).  However, that deference "is predicated on counsel's performance

8   of sufficient investigation and preparation to make reasonably informed, reasonably sound

9   judgments." *Mayfield v. Woodford*, 270 F.3d 915, 927 (9th Cir. 2001) (en banc).

10        The petitioner must also show prejudice from the inadequate performance.  To establish

11   prejudice in this context, petitioner must demonstrate that, but for counsel's errors, he probably

12   would have prevailed on appeal. *Miller v. Keeney*, 882 F.2d 1428, 1434 n.9 (9th Cir. 1989).

13        Petitioner argues that his counsel was ineffective because he did not properly investigate

14   Mr. Spinks's background prior to trial.  However, petitioner has not shown that his counsel's

15   failure to investigate was outside the wide range of professionally competent assistance since

16   counsel did not have reason to question whether Mr. Spinks was a minister.[3]  Moreover, as the

17   state appellate court noted, "[i]n a church with no formal title of 'minister,'" it was not

18   inaccurate for Mr. Spinks, who "evangelizes at a welfare office[,] to describe himself as a

19   _____

20        [3]  Interestingly, in his opening brief before the state appellate court, petitioner argued that
     he did not lack diligence by failing to investigate Mr. Spinks's background.  Petitioner stated:

21
22        Even if a diligent defense attorney were to seek out evidence with which to
        impeach a key prosecution witness, due diligence would not necessarily require
23        him to investigate those aspects of a witness' background which did not appear to
        bear directly upon the witness' anticipated testimony in the case and which did
24        not reasonably appear to be subject to serious question. . . .  Determining that
        each prospective prosecution witness had accurately stated his or her occupational
25        status or other routine facts about his background generally would not be
        perceived by reasonable counsel as an area requiring vigorous investigation, if
        any.

26   Answer, Ex. A at 64.

minister of his church."  Answer, Ex. B at 9.  At the new trial hearing, the assistant pastor at the church stated that the church does encourage its members to minister to others, and Mr. Spinks told the pastor on two occasions that he was engaged in "street ministry."  *Id.*

Petitioner also has not shown that he was prejudiced by his trial counsel's failure to investigate Mr. Spinks's background.  As noted by the state appellate court, "there is nothing in the testimony of Mr. Spinks harmful to [petitioner] even as magnified with the presumably enhanced credibility adhering to one perceived as an ordained minister.  From the outset, Mr. Spinks indicated a positive opinion of [petitioner . . . and] in fact corroborated [petitioner]'s theory of self-defense, describing an agitated victim holding a possible weapon behind his back."  *Id.* at 10.  Although Mr. Spinks testified that he did not see the victim advance toward petitioner with a knife (as petitioner contends), his testimony concurred with the testimony of Simon White, Pete Rangel, Antoinette Buckley, and Robin Spinks on that very issue.  In fact, none of the witnesses corroborated petitioner's version of the story.

Petitioner offers the declarations of jurors Jones and Gant to support his position that he was prejudiced by his attorney's failure to investigate Mr. Spinks's background.  However, even assuming that his declarations are admissible for this purpose,[4] petitioner's declarations do not establish that he was prejudiced by counsel's allegedly deficient performance since there is not a reasonable probability that, but for counsel's errors, the result of the proceeding would have been different.  The jurors declare only that they would have viewed the case differently had they known Mr. Spinks was not a minister – they do not state that they would have found petitioner

---

[4]  It is questionable whether the declarations are in fact admissible for that purpose.  Federal Rule of Evidence 606(b) specifically prohibits a juror from testifying as to "the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith."

The Federal Rules of Evidence apply to federal habeas proceedings.  Fed. R. Evid. 1101(e); *see also Bibbins v. Dalsheim*, 21 F.3d 13, 16-17 (2d Cir. 1994) (applying Fed. R. Evid. 606(b) rather than state law in determining whether evidence was admissible to impeach a state court verdict); *Silagy v. Peters*, 905 F.2d 986, 1008-09 (7th Cir. 1990) (same); *Stockton v. Commonwealth of Virginia*, 852 F.2d 740, 743-44 (4th Cir. 1988) (same).

1  not guilty.  Indeed, the jurors were specifically instructed at trial not to give any witness "any

2  extra credit based on who they work for," including a church.  RT at 1015.  Moreover, jurors

3  Jones and Gant did not hear the testimony at petitioner's new trial hearing that Mr. Spinks did in

4  fact evangelize at a welfare office and did in fact engage in street ministry.

5       Petitioner also argues that his trial counsel was ineffective because he did not present the

6  declarations of jurors Jones and Gant in support of his motion for a new trial.  However, as noted

7  above, the declarations do not alter the conclusion that petitioner was not prejudiced by his trial

8  counsel's failure to investigate Mr. Spinks's background.  Moreover, in addition to denying

9  petitioner's motion for a new trial on his newly discovered evidence claim (regarding Mr.

10  Spinks's background) because of a lack of prejudice to petitioner, the trial court and the

11  appellate court found that Mr. Spinks did not misidentify himself at trial because the question

12  posed to him at trial asked about his activities in the Stockton community and he was indeed

13  acting as a street minister for the church.  Therefore, the court would have denied petitioner's

14  new trial motion regardless of whether petitioner's counsel had presented the declarations of

15  jurors Jones and Gant.

16       Therefore, the California Supreme Court's rejection of petitioner's ineffective assistance

17  of counsel claim was not contrary to or an unreasonable application of United States Supreme

18  Court authority, nor was it based on an unreasonable determination of the facts.  Accordingly,

19  petitioner is not entitled to habeas relief on this ground.

20  B.   Witness Perjury

21       Petitioner argues that his Sixth and Fourteenth Amendment rights were violated when

22  prosecution witness Spinks allegedly perjured himself on the stand by asserting that he was a

23  minister, even though he was not.  Pet. at 5.  Petitioner contends that he was prejudiced by Mr.

24  Spinks's perjury, as evidenced by the declarations of jurors Jones and Gant, who state that they

25  would have viewed the case differently if they had known Mr. Spinks was not a minister.  *Id.*

26  ////

1   Respondent argues that petitioner has not shown that Mr. Spinks's claim that he was a minister

2   was false, or that petitioner was prejudiced by Mr. Spinks's alleged perjury.  Answer at 19-20.

3   Although aspects of this claim were raised in petitioner's motion for a new trial and in his

4   state appeal, petitioner directly made this claim for the first time in his state habeas petition.

5   Therefore, this court will independently review the record to determine whether the California

6   Supreme Court's ruling on this claim was contrary to or an unreasonable application of clearly

7   established federal law.  *Delgado*, 223 F.3d at 981-82.

8   "It is an established tenet of the due process clause that 'the deliberate deception of the

9   court by the presentation of false evidence is incompatible with the rudimentary demands of

10   justice.'"  *United States v. Rewald*, 889 F.2d 836, 860 (9th Cir. 1989) (quoting *United States v.*

11   *Endicott*, 869 F.2d 452, 455 (9th Cir. 1989)).  "[A] conviction obtained by the knowing use of

12   perjured testimony must be set aside if there is any reasonable likelihood that the false testimony

13   could have affected the jury's verdict."  *United States v. Bagley*, 473 U.S. 667, 680 n.9 (1985);

14   *see also Morales v. Woodford*, 388 F.3d 1159, 1179 (9th Cir. 2004) ("The government's

15   knowing use of perjured testimony to obtain a conviction violates a defendant's right to due

16   process of law.").  There are two components to establishing a claim for relief based on the

17   introduction of perjured testimony at trial.  First, the party seeking relief must establish that the

18   statements were false.  *United States v. Polizzi*, 801 F.2d 1543, 1549-50 (9th Cir. 1986).  Second,

19   the party seeking relief must demonstrate that the prosecution knowingly used the perjured

20   testimony.  *Id.*  Mere speculation regarding these factors is insufficient.  *United States v. Aichele*,

21   941 F.2d 761, 766 (9th Cir. 1991).

22   As argued by respondent, petitioner has not shown that Mr. Spinks's testimony at trial

23   that he was a minister at West Coast World Outreach Church was false, given that Spinks

24   actually did engage in street ministry and evangelized at a local welfare office.  Petitioner also

25   has not shown that the prosecution was aware that Mr. Spinks was not an ordained minister, or

26   that the allegedly false testimony affected the verdict in his case.  In his traverse, petitioner

14

1   argues that the prosecution's awareness that Mr. Spinks was perjuring himself "can be noticed

2   by the prosecution's attempt to explain away the witness' statement of being a 'minister' of the

3   church.  The prosecutor began by painting a picture of all Christians being ministers and

4   eventually theorized that the witness' perjured statements were harmless."  Traverse at 11.

5   However, petitioner's arguments do not demonstrate that the prosecution was aware that Mr.

6   Spinks was not an ordained minister *at the time of trial*.

7         Therefore, the California Supreme Court's rejection of petitioner's witness perjury claim

8   was not contrary to or an unreasonable application of United States Supreme Court authority, nor

9   was it based on an unreasonable determination of the facts.  Accordingly, petitioner is not

10  entitled to habeas relief on this ground.

11        C.    Juror Misconduct

12        Petitioner also contends that his Sixth and Fourteenth Amendment rights were violated

13  because a juror lied during voir dire and introduced extrajudicial information into the jury

14  deliberations.  Pet. at 6.  Petitioner contends juror Vasquez lied when she stated that she could be

15  fair and impartial, and concealed her bias against anyone who used or was involved in drugs.  *Id.*

16  Petitioner also contends that juror Vasquez introduced extrajudicial information into the

17  deliberations.  *Id.*  Petitioner submits the declarations of jurors Jones and James, who aver that a

18  fellow juror (juror Vasquez) had a daughter who was heavily involved with drugs, told the other

19  jurors that "you don't know how they get when they take drugs," and pushed for a first-degree

20  murder conviction.  *Id.*, Exs. A, C.

21        Respondent counters that petitioner's declarations are inadmissible under Federal Rule of

22  Evidence 606(b)), and that even assuming they are admissible, neither of the declarations

23  evidences that juror Vasquez was dishonest or misleading during voir dire.  Answer at 24.

24  Respondent further contends that juror Vasquez's statements during deliberations that people

25  who take drugs are bad and that the other jurors did not know how drug users get when they take

26  drugs did not constitute extrajudicial information since jurors are allowed to bring their life

1   experiences into deliberations.  *Id.* at 25.  Further, respondent argues, even if it is assumed that

2   the statements constituted extrajudicial information, the statements did not have a substantial and

3   injurious effect on the outcome of petitioner's case.  *Id.*

4       Petitioner first raised this claim in his motion for a new trial.  He pointed to juror

5   Vasquez's juror questionnaire, in which juror Vasquez stated that her daughter had used "meth

6   and pot" and had been involved in a criminal matter for drug possession, and in which she stated

7   that she would not automatically disfavor the testimony of a person who used, purchased, or sold

8   elicit drugs and that she could be fair and impartial.  RT at 1000-01.  Petitioner also submitted

9   the declarations of jurors Jones and James.  CT at 412-13; RT at 1025.  Petitioner argued that

10  juror Vasquez had a preconceived position in the case, concealed her bias at voir dire, and

11  introduced outside information during deliberations.  RT at 1001-07.

12      The trial court rejected petitioner's claim.  The court ruled that the declarations of Jones

13  and James were not admissible under California Evidence Code section 1150 because they did

14  not reveal objective manifestations of misconduct.  *Id.* at 1025.  The court found that juror

15  Vasquez's statements were not made to persuade other jurors and did not reveal that she had

16  been dishonest or misleading during voir dire when she indicated that she could be a fair juror.

17  *Id.* at 1026.  The court also found that juror Vasquez's statements were not prejudicial.  *Id.* at

18  1027.

19      Petitioner challenged the trial court's ruling in his appeal to the California Court of

20  Appeal for the Third Appellate District.  In rejecting petitioner's claim, the state appellate court

21  reasoned:

22          According to [petitioner]'s motion for new trial, the questionnaire
            of one of the jurors revealed she had a child with drug abuse
23          problems, but this would not cause her automatically to disfavor
            the testimony of any witness involved with drugs.  The prosecutor
24          specifically voir dired her on this point.  She stated her experience
            made her aware of "the types of stories that . . . [drug users] tell,"
25          but this would not make her prejudge a witness because she had to
            hear "both sides of the issue"; "even a person that does drugs,
26          there's always that other side . . . ."  Defense counsel did not seek

                                              16

to question her about this.

In the motion for new trial, [petitioner] included the affidavits of two other jurors. One averred "a female juror" asserted that anyone who took drugs was "completely bad," based on the experience of that juror with her daughter's drug use. The affidavit added that the female juror "was moved to tears" at the prospect of [petitioner] not being guilty of first degree murder when the jury was deliberating on the degree of the offense. The other affidavit was similar, naming the juror with the drug-abusing daughter and asserting that this juror had told the others that they did not know how drug abusers "'get when they take drugs'" and had been unwilling to consider anything other than a conviction for first degree murder.

In ruling on the motion, the trial court concluded the affidavits did not reveal objective manifestations of misconduct. The parties were aware of the juror's attitude toward those who took drugs based on her daughter's problems with drug abuse; to the extent the affidavits purported to demonstrate she had concealed her inability to be open-minded in connection with the testimony of a drug user, this was inadmissible evidence of the mental processes of the juror. As for the possibility her attitude toward drug users might have influenced her vote on the degree of the crime, there was no prejudice to [petitioner] because the jury could not return a verdict on the degree of the crime and the parties stipulated to the lesser offense.

The threshold consideration in a claim of juror misconduct is the admissibility of the evidence in support of the claim. The proponent may introduce only evidence of overt acts.

The trial court's reasoning was correct. Limited to the overt statements of the challenged juror, there is no evidence of concealed bias. The parties were well aware of these facts when they decided to seat the juror. The attempt to rely on these statements for anything beyond their face value is an effort to deduce the juror's mental processes in deliberations, and thus the affidavits are incompetent to that end. As for the claim the affidavits show admissible evidence of misconduct on the face of the juror's statement, in that she attempted to persuade the other jurors based on evidence dehors the trial record (her experiences with her daughter), this is not akin to [*People v. Nesler*, 16 Cal. 4th 561, 590 (1997)] where the juror imparted information *about the defendant* obtained from extrajudicial sources. Rather, the juror based her position during deliberations on her life experiences with a drug abuser. "Jurors bring to their deliberations knowledge and beliefs about general matters of law and fact that find their source in everyday life and experience. That they do so is one of the strengths of the jury system. It is also one of its weaknesses . . . . Such a weakness, however, must be tolerated." This consequently

17

1
2
3

> was not misconduct.  As for the effect of her possible bias on her
> deliberations on the degree of the crime, the court was correct
> there was no possible prejudice even if the claim was cognizable.
> The trial court thus correctly rejected this ground for a new trial.

4 Answer, Ex. B at 10-13 (internal footnotes omitted) (emphasis in original).  Because the Court of

5 Appeal issued a reasoned opinion addressing the merits of petitioner's juror bias and misconduct

6 claims, this court will review that opinion to determine whether petitioner is entitled to habeas

7 relief on those claims.  *Robinson*, 360 F.3d at 1055.

8               1.   <u>Juror Bias</u>

9       The Sixth Amendment right to a jury trial "guarantees to the criminally accused a fair

10 trial by a panel of impartial, 'indifferent' jurors."  *Irvin v. Dowd*, 366 U.S. 717, 722 (1961); *see*

11 *also Ross v. Oklahoma*, 487 U.S. 81, 85 (1988); *Green v. White*, 232 F.3d 671, 676 (9th Cir.

12 2000).  Due process requires that the defendant be tried by "a jury capable and willing to decide

13 the case solely on the evidence before it."  *Smith v. Phillips*, 455 U.S. 209, 217 (1982).  Jurors

14 are objectionable if they have formed such deep and strong impressions that they will not listen

15 to testimony with an open mind.  *Irvin*, 816 U.S. at 722 n.3.  A defendant is denied the right to an

16 impartial jury if even one juror is biased or prejudiced.  *Dyer v. Calderon*, 151 F.3d 970, 973

17 (9th Cir. 1998) (en banc); *United States v. Eubanks*, 591 F.2d 513, 517 (9th Cir. 1979).  Thus,

18 "[t]he presence of a biased juror cannot be harmless; the error requires a new trial without a

19 showing of actual prejudice."  *United States v. Gonzalez*, 214 F.3d 1109, 1111 (9th Cir. 2000)

20 (quoting *Dyer*, 151 F.3d at 973 n.2).

21       Courts have analyzed juror bias under two theories, actual bias and implied (or

22 presumed) bias, either of which may support a challenge of a prospective juror for cause.  *Fields*

23 *v. Brown*, 503 F.3d 755, 766 (9th Cir. 2007).  Actual bias is "'bias in fact' – the existence of a

24 state of mind that leads to an inference that the person will not act with entire impartiality."

25 *Gonzalez*, 214 F.3d at 1112 (quoting *United States v. Torres*, 128 F.3d 38, 43 (2d Cir. 1997)).

26 ////

1   "Although actual bias is the more common grounds for excusing jurors for cause, '[i]n

2   extraordinary cases, courts may presume bias based upon the circumstances.'"  *Gonzalez*, 214

3   F.3d at 1112 (quoting *Dyer*, 151 F.3d at 981); *see also McDonough Power Equipment, Inc. v.*

4   *Greenwood*, 464 U.S. 548, 556-57 (1984).  Thus, the Ninth Circuit has, in several cases,

5   presumed bias from "the 'potential for substantial emotional involvement, adversely affecting

6   impartiality,' inherent in certain relationships." *Tinsley v. Borg*, 895 F.2d 520, 527 (9th Cir.

7   1990) (quoting *United States v. Allsup*, 566 F.2d 68, 71 (9th Cir. 1977)); *see also Green*, 232

8   F.3d at 676; *Gonzalez*, 214 F.3d at 1112-14; *Dyer*, 151 F.3d at 981-82; *Eubanks*, 591 F.2d at

9   517.

10          The distinction between actual and implied bias has been explained as follows:

11          Unlike the inquiry for actual bias, in which we examine the juror's
            answers on voir dire for evidence that she was in fact partial, the
12          issue for implied bias is whether an average person in the position
            of the juror in controversy would be prejudiced.  Accordingly, we
13          have held that prejudice is to be presumed where the relationship
            between the prospective juror and some aspect of the litigation is
14          such that it is highly unlikely that the average person could remain
            impartial in his deliberations under the circumstances.
15

16   *Gonzalez*, 214 F.3d at 1112 (citations and internal quotes omitted) (emphasis in original).

17   Accordingly, implied bias may be found despite a juror's denial of any partiality. *Torres*, 128

18   F.3d at 45 ("And in determining whether a prospective juror is impliedly biased, 'his statements

19   upon voir dire [about his ability to be impartial] are totally irrelevant.'"); *Gonzales v. Thomas*, 99

20   F.3d 978, 987 (10th Cir. 1996); *United States v. Nell*, 526 F.2d 1223, 1229 n.8 (5th Cir. 1976)

21   (The concept of implied or presumed bias arises from "situations in which the circumstances

22   point so sharply to bias in a particular juror that even his own denials must be discounted.").

23   Implied bias is bias conclusively presumed as a matter of law. *United States v. Wood*, 299 U.S.

24   123, 133 (1936); *United States v. Greer*, 285 F.3d 158, 171 (2d Cir. 2000) (citing *Torres*, 128

25   F.3d at 45).  On collateral review, a petitioner alleging juror misconduct must show that the

26   alleged error "'had substantial and injurious effect or influence in determining the jury's

                                                    19

1    verdict.'" *Jeffries v. Blodgett*, 5 F.3d 1180, 1190 (9th Cir. 1993) (quoting *Brecht v.*

2    *Abrahamson*,507 U.S. 619, 637 (1993)).

3        Here, there is no evidence juror Vasquez harbored any actual bias against petitioner.

4    There is no evidence that she responded dishonestly or intended to mislead the trial court or the

5    parties when she stated on voir dire that she could be fair and would not prejudge any of the

6    witnesses.  She specifically notified the court and the parties that she had a child with drug abuse

7    problems.  Nor did the nature of her daughter's drug abuse constitute a valid basis for a

8    challenge for cause, carry the "potential for substantial emotional involvement, adversely

9    affecting impartiality," *Tinsley*, 895 F.2d 527, or make it "highly unlikely that the average person

10    could remain impartial in his deliberations." *Gonzalez*, 214 F.3d at 1112.  This simply is not the

11    type of "extraordinary" case where bias may be implied or presumed.  Moreover, there is no

12    evidence before this court that the presence of juror Vasquez on petitioner's jury prejudiced

13    petitioner to the extent that he did not receive a fair trial.  Therefore, the state courts' rejection of

14    petitioner's bias claim was not contrary to or an unreasonable application of United States

15    Supreme Court authority, nor was it based on an unreasonable determination of the facts.

16    Accordingly, petitioner is not entitled to habeas relief on this ground.[5]

17

---

18        [5] The declarations that the petitioner offers to show that juror Vasquez (who had a

19    daughter who was heavily involved with drugs) told the other jurors that "you don't know how they get when they take drugs" and pushed for a first-degree murder conviction are inadmissible

20    to show petitioner's state of mind during deliberations.  Federal Rule of Evidence 606(b) specifically prohibits a juror's testimony "as to any matter or statement occurring during the

21    course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or

22    concerning the juror's mental processes in connection therewith."  As the state appellate court noted, "[t]he parties were aware of the juror's attitude toward those who took drugs based on her

23    daughter's problems with drug abuse; to the extent the affidavits purported to demonstrate that she had concealed her inability to be open-minded in connection with the testimony of a drug

24    user, this was inadmissible evidence of the mental processes of the juror."  Answer, Ex. B at 11-12.  Additionally, "[t]he attempt to rely on these statements for anything beyond their face value

25    is an effort to deduce the juror's mental processes in deliberations, and thus the affidavits are incompetent to that end."  *Id.* at 12.

26        Nonetheless, even if the declarations were admissible, they do not establish that juror Vasquez harbored any bias toward petitioner or that she lied or was misleading during voir dire.

2.    Extraneous Information During Deliberations

Petitioner also claims that his rights were violated when juror Vasquez introduced extrajudicial information into the jury deliberations.  In support of his claim, petitioner asks this court to consider the declarations of two other jurors (Jones and James) regarding what occurred during jury deliberations.  However, it is unclear whether those declarations are admissible under Federal Rule of Evidence 606(b).

Rule 606(b) provides:

> Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon that or any other juror's mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning the juror's mental processes in connection therewith.  *But a juror may testify about (1) whether extraneous prejudicial information was improperly brought to the jury's attention*, (2) whether any outside influence was improperly brought to bear upon any juror, or (3) whether there was a mistake in entering the verdict onto the verdict form.  A juror's affidavit or evidence of any statement by the juror may not be received on a matter about which the juror would be precluded from testifying.

Fed. R. Evid. 606(b) (emphasis added).  As discussed in *Sassounian v. Roe*, 230 F.3d 1097 (9th Cir. 2000), juror testimony may be considered to demonstrate that extraneous evidence or information was introduced during the jury's deliberation, but not to show the subjective impact of that extraneous information:

> A long line of precedent distinguishes between juror testimony about the consideration of extrinsic evidence, which may be considered by a reviewing court, and juror testimony about the subjective effect of evidence on the particular juror, which may not. . . .  Therefore, although we may consider testimony concerning whether the improper evidence was considered, we may not consider the jurors' testimony about the subjective impact of the improperly admitted evidence.

*Id*. at 1108-09; *see also Tanner v. United States*, 483 U.S. 107, 127 (1987) ("[L]ong-recognized and very substantial concerns support the protection of jury deliberations from intrusive inquiry.").

21

1    Generally, information acquired from a third party or from outside reference during jury

2    deliberation is considered extrinsic and evidence that the jury received such information is

3    admissible under Rule 606(b) to impeach the verdict.  *See United States v. Navarro-Garcia*, 926

4    F.2d 818, 821 (9th Cir. 1991) ("Evidence not presented at trial, acquired through out-of-court

5    experiments or otherwise, is deemed 'extrinsic.'"); *Marino v. Vasquez*, 812 F.2d 499, 505-06

6    (9th Cir. 1987) (finding admissible as an "outside influence" information that a juror consulted a

7    dictionary to define the word "malice"); *Gibson v. Clanon*, 633 F.2d 851, 855 (9th Cir. 1980).

8    However, jurors may rely on their personal experiences in deliberating and in doing so

9    are not exposed to extrinsic evidence.  *See Price v. Kramer*, 200 F.3d 1237, 1255 (9th Cir.), *cert.*

10   *denied*, 531 U.S. 816 (2000) (finding that there was no improper extraneous evidence when,

11   during deliberation, two jurors shared past personal experiences which were of a general nature);

12   *Navarro-Garcia*, 926 F.2d at 821; *Casey v. United States*, 20 F.2d 752, 754 (9th Cir. 1927).

13   (b).  The shared personal experiences of jurors become extraneous information if the "juror has

14   personal knowledge regarding the parties or the issues involved in the litigation that might affect

15   the verdict."  *Navarro-Garcia*, 926 F.2d at 821.  Such information may also be deemed

16   extraneous "if the jury considers a juror's past personal experiences in the absence of any record

17   evidence on a given fact, as personal experiences are relevant only for purposes of interpreting

18   the record evidence."  *Id*. at 822.

19   Here, juror Vasquez's statements about her daughter's drug use and about the effects of

20   drug use did not constitute extraneous information.  Rather, they reflect her own personal life

21   experiences with a drug abuser.  She did not share "personal knowledge regarding the parties or

22   the issues involved in the litigation that might affect the verdict" and did not consider her "past

23   personal experiences in the absence of any record evidence on a given fact."  *Id.* at 821-22.

24   Moreover, even if juror Vasquez's statements could be deemed extraneous information, in light

25   of the other evidence in this case, it is clear that such statements did not have a "substantial and

26   injurious effect or influence in determining the jury's verdict," such that habeas relief would be

warranted.  *See Sassounian*, 230 F.3d at 1108 (quoting *Brecht*, 507 U.S. at 623).

Additionally, any statements juror Vasquez made during deliberations suggesting that she wanted petitioner to be convicted of first degree murder did not constitute extraneous information and did not indicate that an outside influence was improperly brought to bear upon her.  Rather, the other jurors' declarations regarding such statements attempt to show the effect petitioner's drug use may have had on her "mind or emotions as influencing the juror to assent to or dissent from the verdict or indictment or concerning [her] mental processes in connection therewith." Therefore, they are expressly precluded from consideration by this court.  Fed. R. Evid. 606(b).

Finally, as the appellate court stated, "[a]s for the possibility her attitude toward drug users might have influenced her vote on the degree of the crime, there was no prejudice to [petitioner] because the jury could not return a verdict on the degree of the crime and the parties stipulated to the lesser offense."  Answer, Ex. B at 12.

Therefore, the state courts' rejection of this claim was not contrary to or an unreasonable application of United States Supreme Court authority, and was not based on an unreasonable determination of the facts.  Accordingly, the petition should be denied as to this claim.

D.    Prosecution's Failure to Disclose Evidence/Vouching for Credibility of Witness

Finally, petitioner contends that his Sixth and Fourteenth Amendment rights were violated when the prosecution failed to disclose to him during discovery favorable evidence regarding a deal they made with one of the trial witnesses, and when the prosecution vouched for the credibility of witness Gerald Spinks during trial.  Pet. at 6.

1.    Failure to Disclose Evidence

Petitioner submits the declarations of his trial attorney, Charles Slote, and the attorney for witness Pete Rangel, Deborah Fialkowski.  *Id.*, Exs. D, E.  Mr. Slote avers, *inter alia*, that after petitioner's trial, the prosecutor called him to inform him that a discovery violation had occurred and that witness Rangel had been offered a deal in exchange for testifying.  *Id.*  Ms. Fialkowski

1  avers that the prosecutor stated that he would dismiss the charges against Mr. Rangel if he could

2  speak with him, but that Mr. Rangel agreed to testify without any prior knowledge of a plea deal

3  and was never aware of any agreement.  *Id.*

4        Respondent counters that the evidence the prosecution failed to disclose was not material

5  since Mr. Rangel was thoroughly impeached at trial and already had poor credibility.  Answer at

6  27.  Respondent argues that information about the agreement between the prosecution and Mr.

7  Rangel's attorney would not have significantly altered the jury's determination as to Mr.

8  Rangel's poor credibility, especially since Mr. Rangel was never even aware of the agreement.

9  *Id.*  Respondent further argues that in any event, Mr. Rangel's testimony was only corroborative

10  of the other evidence of petitioner's guilt; therefore, the prosecution's failure to disclose this

11  evidence did not affect the jury's determination of the verdict.  *Id.*

12        Petitioner made this claim in his motion for a new trial.  During the hearing on the

13  motion, the court stated:

14              The standard becomes it would have to be [a] reasonable
               probability that a result more favorable would have occurred if the
15              – if that information [regarding the government's deal with Mr.
               Rangel] was given.  So, at least with the issue of Mr. Rangel, at
16              least in my mind, the Court is more focused on the issue, if the jury
               had known about those, what effect, if any, would it have on the
17              evaluation of Mr. Rangel?

18              Because, quite frankly, Mr. Rangel was impeached not only by [his
               use of drugs, his convictions of numerous crimes, and the fact that
19              he was awaiting trial on other crimes], but also his mental health
               status, and the fact that he was taking medications at the time.
20
               At least the Court's viewing of Mr. Rangel's testimony is Mr.
21              Rangel's testimony was one who – whose weight – I mean, he's an
               individual you had to see to fully appreciate his testimony.  And
22              his testimony was only as good as it was corroborated by someone
               else's.  He was not a witness [] whom the jurors would put weight
23              in because Mr. Rangel said it – because of all those items that
               came up.  At least that was the Court's very distinct impression of
24              Mr. Rangel.

25  RT at 978, 980.

26  ////

24

1    In rejecting the claim, the court added:

2         As I mentioned earlier on the record, Mr. Rangel was extensively
          cross-examined about drug use, about prior convictions, about
3         mental health, and being on medication for mental health at the
          time of the offense.
4
          . . . Had it been brought out into evidence that his attorney was
5         offered, even though he didn't know of a potential deal, to talk
          about or to testify in the case, I don't think it would – in the
6         Court's opinion would have absolutely zero effect on the purpose
          of the trial.
7
          Not only can I not find a reasonable probability that it would have
8         affected the result, I can find zero effect.
          Mr. Rangel, as the Court indicated earlier, an individual you had to
9         see to be able to evaluate, was such that he was not an individual
          who jurors would have given any credence to based on his
10        testimony by itself because of all the problems that Mr. Rangel
          had.  And he's not the type of individual – I don't think any
11        reasonable juror could have given any weight to – absent anything
          corroborating, what he testified to.
12

13   *Id.* at 1012.

14        Petitioner did not appeal this issue to the state appellate or supreme court, but did raise

15   the issue again in his state habeas petition.  Answer, Ex. E at 4.  Because the trial court issued a

16   reasoned opinion addressing the merits of this claim, this court will review that opinion to

17   determine whether petitioner is entitled to habeas relief on that claim.  *Robinson*, 360 F.3d at

18   1055.

19        A criminal defendant's due process rights are violated when a prosecutor fails to disclose

20   material, exculpatory evidence to petitioner before trial, in violation of *Brady v. Maryland*, 373

21   U.S. 83.  In determining whether the prosecution committed a *Brady* violation, the court must

22   consider whether the suppressed evidence was: (1) favorable to the accused, (2) suppressed by

23   the government and (3) "material to the guilt or innocence of the defendant."  *United States v.*

24   *Jernigan*, 492 F.3d 1050, 1053 (9th Cir. 2007) (en banc).  A *Brady* violation is material when

25   "there is a reasonable probability that, had the evidence been disclosed to the defense, the result

26   of the proceeding would have been different."  *Bagley*, 473 U.S. at 682; *see also Kyles v.*

25

*Whitley*, 514 U.S. 419, 434-36 (1995).  "A 'reasonable probability' of a different result [exists] when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'"  *Kyles*, 514 U.S. at 434 (quoting *Bagley*, 473 U.S. at 678).

Here there is no dispute regarding whether the evidence of Mr. Rangel's proposed plea deal was favorable to petitioner or was suppressed by the government.  The relevant issue is whether that evidence was material to petitioner's guilt or innocence.  It does not appear that it was.  This court is not convinced that there is a reasonable probability that had the evidence been provided to petitioner, the result of the trial would have been different.  As the trial court noted, Mr. Rangel's trial testimony had already been impeached by his use of drugs, his convictions of numerous crimes, the fact that he was awaiting trial on other crimes, his mental health status, and the fact that he was taking medications at the time of trial; therefore, the admission of impeachment evidence regarding Mr. Rangel's plea deal – of which Mr. Rangel was unaware – would have had very little weight.  There is little chance Rangel's testimony made a difference in the outcome.  According to the trial judge who observed his testimony at trial, Mr. Rangel's "testimony was only as good as it was corroborated by someone else's" and was not likely to be given much weight by the jury.  RT at 980.  Moreover, even if Mr. Rangel's testimony would have been given less weight had the defense been able to thoroughly impeach him, Mr. Rangel's testimony was corroborative of the testimony of various other witnesses and other trial evidence.  Consequently, although the prosecution erred in failing to disclose the information about Mr. Rangel's plea deal during petitioner's trial, that alone does not undermine confidence in the outcome of the trial.  Therefore, the state courts' rejection of this claim was not contrary to or an unreasonable application of United States Supreme Court authority, and was not based on an unreasonable determination of the facts.

2.  Vouching for the Credibility of a Witness

Petitioner also argues that the prosecution committed misconduct when it vouched for the credibility of witness Gerald Spinks.  Pet. at 6.  Petitioner contends that during their opening and

closing statements, the prosecution "relied on boasting the credibility of [Mr.] Spinks who

claimed to be a minister . . . which ultimately prejudiced the jury." *Id.*  In his traverse, petitioner

adds that the prosecution "repeatedly made reference to the witness' contrived title, and

constantly 'vouched' for the witness' veracity specifically because he was supposedly a

minister."  Traverse at 18.  Respondent does not directly respond to this claim in his answer.

Petitioner raised this claim for the first time in his state habeas petition, which was denied

without comment.[6]  Therefore, this court will independently review the record to determine

whether the state Supreme Court's ruling denying this claim was contrary to or an unreasonable

application of clearly established federal law.  *Delgado*, 223 F.3d at 981-82.

It is improper for the prosecution to vouch for the credibility of a government witness.

*United States v. Young*, 470 U.S. 1, 18 (1985).  "Improper vouching typically occurs in two

situations: (1) the prosecutor places the prestige of the government behind a witness by

expressing his or her personal belief in the veracity of the witness, or (2) the prosecutor indicates

that information not presented to the jury supports the witness's testimony."  *United States v.*

*Brooks*, 508 F.3d 1205, 1209 (9th Cir. 2007) (quoting *United States v. Hermanek*, 289 F.3d

1076, 1098 (9th Cir. 2002)); *see also United States v. Garcia-Guizar*, 160 F.3d 511, 520 (9th

Cir. 1998).

Relief for claims of prosecutorial misconduct is limited to cases in which the petitioner

can establish that prosecutorial misconduct resulted in actual prejudice.  *Johnson v. Sublett*, 63

F.3d 926, 930 (9th Cir. 1995) (citing *Brecht*, 507 U.S. at 637-38); *see also Darden v.*

*Wainwright*, 477 U.S. 168, 181-83 (1986); *King v. Schriro*, 537 F.3d 1062, 1069 (9th Cir. 2008).

Put another way, prosecutorial misconduct violates due process when it has a substantial and

---

[6] Although it is unclear whether this claim has been properly exhausted, respondent
asserts in his answer that "[p]etitioner has exhausted his state court remedies on the claims
presented in the present habeas application."  Answer at 2; *see* 28 U.S.C. § 2254(b)(3) ("A State
shall not be deemed to have waived the exhaustion requirement or be estopped from reliance
upon the requirement unless the State, through counsel, expressly waives the requirement.").

1   injurious effect or influence in determining the jury's verdict.  *See Ortiz-Sandoval v. Gomez*, 81

2   F.3d 891, 899 (9th Cir. 1996).  It is the petitioner's burden to state facts that point to a real

3   possibility of constitutional error in this regard.  *See O'Bremski v. Maass*, 915 F.2d 418, 420 (9th

4   Cir. 1990).  "The relevant question is whether the prosecutors' comments 'so infected the trial

5   with unfairness as to make the resulting conviction a denial of due process."  *Darden*,  477 U.S.

6   at 181 (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637 (1974)).

7          Petitioner has not shown that the prosecution placed the prestige of the government

8   behind Mr. Spinks or indicated that information not presented to the jury supported Mr. Spinks's

9   testimony.  Petitioner has not shown that the prosecutor vouched for the truthfulness of Mr.

10  Spinks's testimony, provided personal assurances of his veracity, suggested or referred to

11  something that was not in the record, or invited the jurors to rely on the integrity of the

12  government.  Petitioner's only claim appears to be that the prosecution should not have referred

13  to Mr. Spinks as a minister or reminded the jury that he was a minister.  However, such conduct

14  does not constitute vouching.  And, even if it did, petitioner has not shown that such conduct "so

15  infected the trial with unfairness as to make the resulting conviction a denial of due process."

16  *Darden*,  477 U.S. at 181.  Therefore, the California Supreme Court's rejection of this claim was

17  not contrary to or an unreasonable application of United States Supreme Court authority, and

18  was not based on an unreasonable determination of the facts.

19  III.   Recommendations

20         For all of the foregoing reasons, IT IS HEREBY RECOMMENDED that petitioner's

21  application for a writ of habeas corpus be denied.

22         These findings and recommendations are submitted to the United States District Judge

23  assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(l).  Within twenty-one

24  days after being served with these findings and recommendations, any party may file written

25  objections with the court and serve a copy on all parties.  Such a document should be captioned

26  "Objections to Magistrate Judge's Findings and Recommendations."  Failure to file objections

within the specified time may waive the right to appeal the District Court's order. *Turner v. Duncan*, 158 F.3d 449, 455 (9th Cir. 1998); *Martinez v. Ylst*, 951 F.2d 1153 (9th Cir. 1991).  In his objections petitioner may address whether a certificate of appealability should issue in the event he files an appeal of the judgment in this case.  *See* Rule 11, Federal Rules Governing Section 2254 Cases (the district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant).

DATED:   December 18, 2009.

EDMUND F. BRENNAN
UNITED STATES MAGISTRATE JUDGE

29